Not For Publication

# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF CONNECTICUT

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -
)
IN RE:                                    )        CASE NO.          11-30562 (LMW)
                                          )
  LYNNE HUNT,                             )        CHAPTER           7
                                          )
        DEBTOR.                           )
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -
  JASON PERRY and                         )        ADV. PRO. NO.     11-3031 (LMW)
  CATHERINE PERRY,                        )
                                          )
        PLAINTIFFS                        )        ECF NO.           1
                                          )
        vs.                               )
                                          )
  LYNNE HUNT,                             )
                                          )
        DEFENDANT.                        )
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

## APPEARANCES

Jim Loughlin, Esq.                        Attorney for Plaintiffs
Loughlin Law, PC
401 Center Street
Wallingford, CT 06492


Lynne Hunt                                Defendant/Debtor *Pro Se*
14140 Wedgewood Ct.
Davie, FL 33325

## MEMORANDUM OF DECISION AND ORDER
## RE: COMPLAINT TO DETERMINE DISCHARGEABILITY OF DEBT

Lorraine Murphy Weil, Chief United States Bankruptcy Judge

The matter before the court is the amended complaint (ECF No. 26) of the above-referenced

plaintiffs (the "Plaintiffs") seeking a determination that: (1) a certain alleged debt owing to them

from the above-referenced defendant (the "Debtor") is not discharged in this chapter 7 bankruptcy

case pursuant to 11 U.S.C. § 523(a)(4); and (2) the Debtor engaged in unfair acts and/or practices

with respect to leasing the Premises (as defined below) under the Connecticut Unfair Trade Practices

Act ("CUTPA"), *see* Conn. Gen. Stat. §§ 42-110a *et seq.*, and seek an award of attorney's fees

pursuant to Conn. Gen. Stat. § 42-110g.  This court has jurisdiction over this adversary proceeding

and authority to enter a final order or final judgment herein pursuant to 28 U.S.C. §§ 157(b) and

1334 and that certain order dated September 21, 1984 of the District Court (Daly, J.).[1]  This

memorandum constitutes the findings of fact and conclusions of law required by Rule 7052 of the

Federal Rules of Bankruptcy Procedure.

## I.    BACKGROUND

This chapter 7 case was commenced by the Debtor by petition filed on March 8, 2011.  (*See*

Case ECF No. 1.)[2]  The Debtor received her chapter 7 discharge on June 28, 2011.  (*See* Case ECF

No. 21.)

The Plaintiffs commenced this adversary proceeding by that certain Complaint To Determine

Dischargeability of Debt and for Entry of Judgment filed on June 14, 2011.  (*See* ECF No. 1, the

"Complaint".)  The Complaint sought a determination that the below-described debt (the "Debt")

---

[1]    That order referred to the "Bankruptcy Judges for this District" "all cases under Title
11, U.S.C., and all proceedings arising under Title 11, U.S.C., or arising in or related to a case under
Title 11, U.S.C. . . . . "

[2]    References herein to the docket of this chapter 7 case appear in the following form:
"Case ECF No. __."  References herein to the docket of this adversary proceeding appear in the
following form: "ECF No. __."

owing by the Debtor to the Plaintiffs was not discharged in this chapter 7 case pursuant to 11 U.S.C.

§§ 523(a)(2) and/or 523(a)(4).[3]  The Debtor filed her answer to the Complaint on July 11, 2011. (*See*

ECF No. 10.)  Subsequently and with leave of the court, the Plaintiffs filed an Amended Complaint

which is stated two counts: First Count – relief under Conn. Gen. Stat. § 47a-21; and Second Count

– Violation of CUTPA pursuant to Conn. Gen. Stat. § 42-110a.  (*See* ECF No. 26, the "Amended

Complaint").[4]

A trial (the "Trial") was held on the Amended Complaint on November 7, 2011.  At the Trial,

Plaintiff Jason Perry (the "Plaintiff" or "Mr. Perry") testified for the Plaintiffs; the Debtor was

permitted to make statements under oath on her behalf and was cross-examined by counsel for the

Plaintiffs.  The Plaintiffs and the Debtor placed documentary evidence into the record.[5]  At the

conclusion of the Trial, the court took the matter under advisement (subject to post-trial briefing).

Post-trial briefing is complete and the matter now is ripe for the decision set forth below.

---

[3]      As noted, the Complaint alleges a cause of action under 11 U.S.C. § 523(a)(2) but the Plaintiffs appear to have abandoned that cause of action at Trial (as defined below) and in their post-trial brief.  (*See* ECF Nos. 33, 37.)

[4]      The court notes that the Complaint and the Amended Complaint seek a determination of nondischargeability only in the prayer for relief and do not set out a separate count in which an explanation is given as to why Plaintiffs are entitled to that relief.  Because at Trial (as defined below) the Plaintiffs flushed out the allegations and the court explained to the *pro se* Debtor the nature of the proceedings and the relief sought (*see* ECF No. 28 at 22-24 (remarks of the court)), the court does not believe the lack of a count for determination of nondischargeability is an issue.

The court further notes that counsel for the Plaintiffs stated at the Trial (as defined below) that the Plaintiffs are not seeking any punitive damages on its CUTPA claim, but seek only attorney's fees.  (*See* ECF No. 28 at 16 (statement of Attorney Loughlin).)

[5]      A transcript of the November 7, 2011 Trial appears in the record as ECF No. 28. References herein to Trial exhibits appear in the following form: "Plaintiffs Exh. __" and "Debtor Exh. ___" (as the case may be).

## II.    <u>FACTS</u>

On or about February 28, 2008, the Plaintiffs entered into a Residential Lease (Plaintiffs Exh. A, the "Lease") with the Debtor to lease property known as 20 Currier Place, Cheshire, Connecticut (the "Premises"). The Premises were a townhouse condominium unit that was comprised of a basement level with a finished and an unfinished area, a main floor level with a ½ bathroom, a living room, a dining room and a kitchen and an upstairs level with three bedrooms and two full bathrooms. (*See* ECF No. 28 at 40–41 (testimony of the Debtor).) The townhouse unit also had a garage and a deck off the living room which was accessible only through the living room. (*See id*. at 41.) The Debtor was a "landlord" and the Plaintiffs were "tenants" as defined by Title 47A ("Landlord and Tenant") of the Connecticut General Statutes and subject to the obligations provided for therein. *See* Conn. Gen. Stat. §§ 47a-1 *et seq*. The Lease provided for a term of one (1) year for monthly rent of $1,800.00 (*see* Plaintiffs Exh. A). Thereafter, the Lease term was extended on a month to month basis by a writing until the unit was sold. (*See* Plaintiffs Exh. A, Addendum dated September 6, 2009; ECF No. 28 at 10 (testimony of Mr. Perry).) The Lease also required the Plaintiffs to pay a security deposit of $3,600.00 (the "Security Deposit") to the Debtor (*see* Plaintiffs Exh. A), which was paid.

The Debtor testified that the relationship between the parties became acrimonious in or about January, 2010. (*See* ECF No. 28 at 51 (testimony of the Debtor).) According to the Debtor, the Plaintiffs knew that she was trying to sell the Premises and that she had hired a real estate agent, Sally Bowman, for that purpose. The Debtor stated that issues arose between the parties related to the showing of the Premises. (*See id.* at 41, 51 (testimony of the Debtor).) Subsequently, the Plaintiffs commenced a lawsuit against the Debtor seeking damages for the Debtor's alleged

- 4 -

interference with the Plaintiffs' quiet enjoyment of the Premises.  (*See id*. at 41 (testimony of the

Debtor), 91-92 (testimony of Mr. Perry).)  That lawsuit was settled, which settlement provided

(among other things) that the Plaintiffs would reside at the Premises for March and April, 2010 and

rents for those months would be waived and would then vacate the Premises on or about June 1,

2010 at 11:59 pm leaving the Premises in broom clean condition.  (*See* Plaintiffs Exhs. I, J; *see also*

ECF No. 28 at 41-42, 53 (testimony of the Debtor).)

In or about the end of May, 2010, the Plaintiffs vacated the Premises.  (*See* ECF No. 28 at 10

(testimony of Mr. Perry).)  On or about June 3, 2010, the Plaintiff and Ms. Bowman did a walk

through of the Premises.  (*See* Plaintiffs Exh. D.)  Ms. Bowman subsequently sent an e-mail to the

Debtor, the Plaintiff and Attorney Loughlin (attorney for the Plaintiffs) in which she stated: "The

garage is full of stuff and garbage.  Not sure how to proceed.  House is empty." (Plaintiffs Exh. D.)

However, the Debtor testified that the Plaintiffs were not fully moved out until about June 5, 2010

because the garage was full of the Plaintiffs' property and/or garbage.  (*See id*. at 43 (testimony of

the Debtor).)  Mr. Perry conceded that a professional cleaning crew came to the Premises "three or

four days after the 4th [of June]" to clean out the garage.  (*See id*. at 105:10-11 (testimony of Mr.

Perry).)

By a certified letter dated June 3, 2010 (return receipt requested), the Plaintiffs requested the

return of the Security Deposit and informed the Debtor of their forwarding address.  (*See* Plaintiffs

Exh. C; *see also* ECF No. 28 at 11 (testimony of the Plaintiff).)  Mr. Perry testified that the letter was

returned to him with "Return To Sender Unclaimed Unable To Forward."  (*See* Plaintiffs Exh. C;

ECF No. 28 at 12 (testimony of the Plaintiff).)  The Debtor testified that she did not receive that

certified letter.  (*See id.* at 63 (testimony of the Debtor).)  Mr. Perry testified that he followed up the

- 5 -

letter with an e-mail requesting the return of his Security Deposit. (*See* ECF No. 28 at 13 (testimony of Mr. Perry).) The Debtor stated that she responded to the Plaintiffs via e-mail with an explanation that none of the Security Deposit would be returned to them. However, it is not clear when the Debtor responded to the Plaintiffs and a copy of that e-mail was not made a part of the record. The Debtor does not contest that she knew the forwarding address of the Plaintiffs.

The Debtor testified that the Plaintiffs paid their rent but, with the exception of the rent due for March, 2008, the rent was always paid after the fifteenth day of the month and was late. (*See* ECF No. 28 at 58 (testimony of the Debtor).)[6] She stated that the late payment of $30.00 was never paid with the rent. (*See id.*) The Debtor also testified that she never invoiced the Plaintiffs for the late payments. (*See id.* at 59.) Mr. Perry disputed the foregoing and testified that he always paid the rent on or before the tenth day of each month. (*See id.* at 92 (testimony of Mr. Perry).) Mr. Perry also testified that the Debtor did not ask him to leave the Premises due to the late payment of rent. (*See id.* at 93-94.) Because the Debtor never invoiced the Plaintiffs for the late fees (*see id.* at 60) or took any other steps in response to the late fee, she appears to have waived those fees.

The Debtor also testified that the Plaintiffs violated the Lease in two other respects. First, no pets were allowed on the Premises "without the prior written consent" of the Debtor. (Plaintiffs Exh. A ¶ 23.) At some point during the Lease term, the Debtor testified that the Plaintiffs brought a dog into the Premises without her permission and in violation of the Lease. (*See* ECF No. at 33, 57-58 (testimony of the Debtor).) She also testified that "[b]ecause I wanted to sell the unit and I

---

[6]     The Debtor testified that although the Lease provided that the rent be paid on the first day of the month (*see* Plaintiffs Exh. A ¶ 1), she had a discussion with Mr. Perry in or about March 2008 in which she orally modified that provision to make rent payments due on or before the tenth day of the month (*see* ECF No. 28 at 60 (testimony of the Debtor)).

didn't want to make any waves, . . . I let the dog stay." (*See id*. at 58:1-6 (testimony of the Debtor).)

The Plaintiff testified that the Debtor never asked them to move out of the Premises because of the

presence of the dog. (*See id.* at 94 (testimony of the Plaintiff).) Given the Debtor's admission that

she allowed the dog to stay on the Premises, she now cannot cite the presence of the dog as a basis

for breach of the Lease.

Second, the Lease provided that the Plaintiffs "shall not use [P]remises for business . . .

activities." (Plaintiffs Exh. A, Addendum to Condominium Lease ¶ 14.) The Debtor testified that

she learned that Mr. Perry was conducting his law practice from the Premises. (*See* ECF No. 28 at

58 (testimony of the Debtor).) Mr. Perry disputed that he ran his law practice out of the Premises,

although he stated that he used the address of the Premises for the bar association and for the

grievance committee but he did not see clients at the Premises and he rented a space on Main Street

in Cheshire. (*See* ECF No. 28 at 89-90 (testimony of Mr. Perry).) Mr. Perry also testified that the

Debtor never mentioned using the Premises as an office to him and did not ask him to leave the

Premises because of that alleged use of the Premises. (*See id*. at 94.) Again, because the Debtor

took no steps when she found out about Mr. Perry's use of the Premises as a law office but continued

to allow him to live there, she now cannot rely on that event as a breach of the Lease.

The Debtor testified that upon receipt of the Security Deposit she placed the funds in her

regular checking account. (*See* ECF No. 28 at 61 (testimony of the Debtor).) She stated that the

funds were commingled with her funds and eventually were spent for personal use. (*See id.* at 62.)

The Debtor testified that she had never been a landlord until she rented the Premises to the Plaintiffs.

(*See* ECF No. 28 at 49 (testimony of the Debtor).) However, the Debtor testified that she had been

a realtor for about ten years. (*See id.* 53.) The Debtor stated that she lost the Premises in a

foreclosure action in or about May, 2011.  (*See id.* at 67.)  Mr. Perry testified that he is a licensed

attorney who practices law in Connecticut.  (*See* ECF No. 28 at 90 (testimony of Mr. Perry).)  He

further testified that his practice primarily is in federal administrative law where he represents the

military at disability hearings.  (*See id.*)

## III.   ANALYSIS UNDER CONN. GEN. STAT. § 47a-21

### A.   The Relevant Statutes

Conn. Gen. Stat. § 47a-21 (hereafter, the "CT Statute") provides in relevant part:

(a) **Definitions.** As used in this chapter:

. . .

(2) "Escrow Account" means any account at a financial institution which is not
subject to execution by the creditors of the person in whose name such account is
maintained and includes a clients' funds account.

. . .

(10) "Security deposit" means any advance rental payment other than an advance
payment for the first month's rent and a deposit for a key or any special equipment.

. . .

(13) "Tenant's obligations" means (A) the amount of any rental or utility payment
due the landlord from a tenant; and (B) a tenant's obligations under the provisions
of [Conn. Gen. Stat.] section 47a-11.

. . .

(c) **Exemption from attachment and execution. Assignment to successor.** Any security
deposit paid by a tenant shall remain the property of such tenant in which the landlord and
his successor shall have a security interest . . . to secure such tenant's obligations. A security
deposit shall be exempt from attachment and execution by the creditors of the landlord or his
successor and shall not be considered part of the estate of the landlord or his successor in any
legal proceeding . . . .

(d) **Payment of security deposit and interest at termination of tenancy.** (1) Within the
time specified in subdivisions (2) and (4) of this subsection, the person who is the landlord
at the time a tenancy is terminated . . . shall pay to the tenant or former tenant: (A) The
amount of any security deposit that was deposited by the tenant with the person who was
landlord at the time such security deposit was deposited less the value of any damages which
any person who was a landlord of such premises at any time during the tenancy of such
tenant has suffered as a result of such tenant's failure to comply with such tenant's

- 8 -

obligations; and (B) any accrued interest due on such security deposit as required by subsection (i) of this section . . . .

(2) Upon termination of a tenancy, any tenant may notify his landlord in writing of such tenant's forwarding address. Within thirty days after termination of a tenancy, each landlord . . . shall deliver to the tenant or former tenant at such forwarding address either (A) the full amount of the security deposit paid by such tenant plus accrued interest as provided in subsection (i) of this section, or (B) the balance of the security deposit paid by such tenant plus accrued interest as provided in subsection (i) of this section after deduction for any damages suffered by such landlord by reason of such tenant's failure to comply with such tenant's obligations, together with a written statement itemizing the nature and amount of such damages. Any such landlord who violates any provision of this subsection shall be liable for twice the amount or value of any security deposit paid by such tenant, except that, if the violation is the failure to deliver the accrued interest, such landlord shall only be liable for twice the amount of such accrued interest.

. . .

(h) **Escrow deposit.** (1) Each landlord shall immediately deposit the entire amount of all security deposits received by him on or after October 1, 1979, from his tenants into one or more escrow accounts for such tenants in a financial institution. Such landlord shall be escrow agent of such account . . . .

(2) Each landlord . . . shall maintain each such account as escrow agent and shall not withdraw the amount of any security deposit or accrued interest on such amount, as provided in subsection (i) of this section, that is in any escrow account from such account except as provided in this section.

. . .

(4) No person shall withdraw funds from any escrow account except as follows: (A) Within the time specified in subsection (d) of this section, each escrow agent shall withdraw and disburse the amount of any security deposit due to any tenant upon the termination of such tenancy, in accordance with subsection (d) of this section, together with accrued interest thereon as provided in subsection (i) of this section. (B) At the time provided for in subsection (i) of this section, each escrow agent shall withdraw from such account and pay to each tenant any accrued interest due and payable to any tenant in accordance with the provisions of said subsection. (C) The escrow agent may withdraw and personally retain interest credited to and not previously withdrawn from such account to the extent such interest exceeds the amount of interest being earned by tenants as provided in subsection (i) of this section. (D) The escrow agent may withdraw and personally retain the amount of damages withheld, in accordance with the provisions of subsection (d) of this section, from payment of a security deposit to a tenant. (E) The escrow agent may at any time during a tenancy withdraw and pay to a tenant all or any part of a security deposit together with accrued interest on such amount as provided in subsection (i) of this section. (F) The escrow agent shall withdraw and disburse funds in accordance with the provisions of subdivision (3) of this subsection. (G) The escrow agent may transfer any escrow account from one financial

institution to another and may transfer funds from one escrow account to another provided that all security deposits in escrow accounts remain continuously in escrow accounts.

(i) **Payment of interest on security deposits.** (1) On and after July 1, 1993, each landlord . . . shall pay interest on each security deposit received by such landlord at a rate [specified in this subsection, "Interest"]. . . .

Conn. Gen. Stat. Ann. § 47a-21 (West 2013).

Conn. Gen. Stat. § 47a-11 (**Tenant's responsibilities)** provides in pertinent part:

A tenant shall: (a) Comply with all obligations primarily imposed upon tenants by applicable provisions of any building, housing or fire code materially affecting health and safety; (b) keep such part of the premises that he occupies and uses as clean and safe as the condition of the premises permit; (c) remove from his dwelling unit all ashes, garbage, rubbish and other waste in a clean and safe manner to the place provided by the landlord pursuant to subdivision (5) of subsection (a) of section 47a-7; (d) keep all plumbing fixtures and appliances in the dwelling unit or used by the tenant as clean as the condition of each such fixture or appliance permits; (e) use all electrical, plumbing, sanitary, heating, ventilating, air conditioning and other facilities and appliances, including elevators, in the premises in a reasonable manner; (f) *not wilfully or negligently destroy, deface, damage, impair or remove any part of the premises or permit any other person to do so*; (g) conduct himself and require other persons on the premises with his consent to conduct themselves in a manner that will not disturb his neighbors' peaceful enjoyment of the premises or constitute a nuisance, as defined in section 47a-32, or a serious nuisance, as defined in section 47a-15; and (h) if judgment has entered against a member of the tenant's household pursuant to subsection (c) of section 47a-26h for serious nuisance by using the premises for the illegal sale of drugs, not permit such person to resume occupancy of the dwelling unit, except with the consent of the landlord.

Conn. Gen. Stat. Ann. § 47a-11 (West 2013) (emphasis added).

**B.     Is there a "debt" within the purview of Section 523**

The tenancy here terminated at some point in or about early June, 2010 when the Plaintiffs fully vacated the Premises. *See Roberts v. Gordon*, No. 1007965, 2009 WL 2872862, at *1 (Conn. Super. Ct. Aug. 10, 2009) ("Termination of tenancy as used in th[e CT S]tatute is considered to be the date the tenant vacates."). The CT Statute then required the Debtor, within thirty (30) days, to either return the Security Deposit in full plus interest or return the balance of the Security Deposit

plus accrued interest along with a "written statement itemizing the nature and amount of . . . [any] damages" resulting from the Plaintiffs' failure to comply with their tenant obligations. *See* Conn. Gen. Stat. § 47a-21(d)(2); *see also Birney v. Barretta*, No. CV NH-5079, 1993 WL 307685, at \*6 (Conn. Super. Ct. July 26, 1993), *aff'd*, 36 Conn. App. 928 (1994) ("The refund or the accounting must be delivered to the tenant within 30 days after the tenant vacates."). Here, thirty days ran in or about early July, 2010 and while the Debtor stated that she sent a response to the request for the return of the Security Deposit, there is nothing in the record to reflect either a timely response to the demand for the Security Deposit or a response in compliance with Section 47a-21(d)(2).[7] Consequently, the court concludes that the Debtor violated Conn. Gen. Stat. § 47a-21(d)(2) and, in accordance with that section, the Debtor is liable to the Plaintiffs for double the value of the Security Deposit or $7,200.00 (plus Interest). *See Roberts, supra* ("A landlord violating the time requirements shall be liable for twice the amount or value of any security deposit paid by the tenant.").

With respect to that amount, the court must determine if any of the damages asserted by the Debtor in her testimony which resulted from the Plaintiffs' alleged failure to comply with their tenant obligations were proper deductions. "It is axiomatic that the burden of proving damages is on the

---

[7]    There are two e-mails that were presented into evidence by the Plaintiffs. It is not clear if either of these e-mails is the one referred to by the Debtor. The first is an e-mail exchange between the Debtor, Sally Bowman, Mr. Perry and Attorney Loughlin dated June 3, 2010 in which the Debtor expresses her "shock" and "upset" after viewing the Premises after the Plaintiffs moved out. (*See* Plaintiffs Exh. D.) She goes on to note that the "unit is filthy" listing specific areas. (*See id.*) While that e-mail may have been timely, it does not comply with Section 47a-21(d)(2). The second e-mail is from the Debtor to Attorney Loughlin (and copied to the Plaintiff, among others) dated September 24, 2010 with the subject "response to the latest law suit." (*See* Plaintiffs Exh. F.) In the e-mail, the Debtor explains and disputes why the Plaintiffs are not entitled to any portion of the Security Deposit. However, as noted, the e-mail is outside the thirty-day response period and cannot be considered by the court on this issue.

party claiming them." *Expressway Assocs. II v. Friendly Ice Cream Corp. of Connecticut*, 218 Conn.

474, 476 (1991). Further, in order "[t]o recover damages for injury to . . . property the plaintiff must

present evidence which affords a reasonable basis for measuring . . . loss." *Ferri v. Pyramid Constr.

Co.,* 186 Conn. 682, 691 (1982) (internal quotation marks omitted).

Generally, a tenant is liable for any willful or negligent damage to property. *See Agostino

v. Cary*, No. CV090006838, 2011 WL 5307381, at *5 (Conn. Super. Ct. Oct. 20, 2011). *See also*

Conn. Gen. Stat. § 47a-11(f), *supra.* Further,

> "[s]ince tenant liability must be based on willful or negligent conduct, the mere fact
> of damage does not necessarily make the tenant liable. Proof of property damage
> requires evidence. The landlord bears the burden of proof on all elements of a
> damage claim. This means that the landlord must prove that (a) the damage occurred,
> (b) it exceeded normal wear and tear, and (c) it was caused by the tenant. Damage
> may be shown either by direct evidence or circumstantially. However, a tenant is not
> liable for damages that already existed when he moved into the apartment or for
> damage which occurred after he vacated. Similarly, he is not liable for damage
> caused by persons for whom he is not responsible."
>
> "The tenant is also not liable for what is usually described as 'normal' or 'reasonable'
> wear and tear.
> . . .
> "The landlord must also establish sufficient evidence of the amount of the damage
> to remove a judgment from the area of speculation. This will not ordinarily require
> expert testimony or appraisals, but it does require the presentation of some evidence
> from which a court can make a reasonable estimate of the amount to be awarded."

*Agostino,* 2011 WL 5307381, at *5 (citation omitted). The Plaintiffs generally dispute any

deductions and deny any negligent conduct on their part. In fact, Mr. Perry testified that the unit was

in a "poor" and "dirty"condition when the Plaintiffs moved in and they left the property in more or

less the same condition. (*See* ECF No. 28 at 87-89 (testimony of Mr. Perry).)

During her testimony, the Debtor placed Debtor Exh. 1 into evidence. Debtor Exh. 1 is a set

of pictures numbered 1 through 59 taken by the Debtor between November 1, 2009 and June 14,

- 12 -

2010 that show damage to the Premises purportedly caused by the Plaintiffs.  The Debtor also

testified that the condominium association and/or the mortgagee subsequently foreclosed on the

Premises and that she lost the property in or about May, 2011.  (*See* ECF No. 28 at 66-67 (testimony

of the Debtor).)  The court will discuss each instance of damage to the Premises caused by the

Plaintiffs as claimed by the Debtor.

**The Siding**

The Debtor testified that the Plaintiffs melted the siding on the house near the deck because

they placed their grill too close to the house.  (*See*  Debtor Exh. 1, Nos. 1-2; ECF No. 28 at 28

(testimony of the Debtor).)  She testified that new siding had been placed on the Premises one year

prior to the Plaintiffs' moving into the unit.  (*See id.* at 29.)  She testified that the condominium

association repaired the siding and that that cost ordinarily would have been charged back to her as

the unit owner but she did not know the cost of the repair.[8]  Because the Debtor did not bear the cost

of replacing the siding (due to the foreclosure), she cannot deduct that charge from the Security

Deposit.

**Hardwood Floors**

The Debtor stated that there was scratches and stains on the hardwood floor purportedly

caused by the Plaintiffs' failure to put padding under the furniture (as she requested) and from the

dog relieving itself in the unit.  (*See* Debtor Exh. 1, Nos. 7-24; ECF No. 28 at 31-33 (testimony of

the Debtor).)  The Debtor testified that the hardwood floors were brand new and were refinished a

year before the Plaintiffs occupied the Premises.  (*See id.* at 33.)  Although she cleaned the hardwood

---

[8]     The Debtor testified that due to the foreclosure of the Premises she did not know how
much was charged by the condominium association to repair the siding.

floors herself, the Debtor did not repair and/or replace the floor due to the damages alleged to have

been caused by the Plaintiffs.  (*See id.* at 46.)  Moreover, the Debtor no longer owns the Premises.

Therefore, a charge for the hardwood floors cannot be deducted from the Security Deposit.

## The Deck

The Debtor testified that the deck was stained by the dog relieving itself out there.  (*See*

Debtor Exh. 1, Nos. 3-5; ECF No. 28 at 29 (testimony of the Debtor).)  The record does not indicate

what was done by the Debtor (or what needed to be done) with respect to the deck.  Consequently,

no charge against the Security Deposit can be made.

## The Door Slider

The Debtor testified that the slider on the door that led to the deck was damaged by the

Plaintiffs' dog because it would scratch at the slider to go out on the deck.  (*See* Debtor Exh. 1, Nos.

25-29; ECF No. 28 at 34 (testimony of the Debtor).)  She stated that a new slider was placed on the

door a year prior to the Plaintiffs' moving into the Premises.  (*See id.* at 46.)  However, the Debtor

testified that she did not replace the damaged slider.  (*See id.*)  Moreover, she no longer owns the

Premises.  Consequently, she cannot deduct the cost of a new slider from the Security Deposit.

## The Carpets

The Debtor testified that the Plaintiffs left the carpet with stains (which she believed were

caused by the dog) when they moved out.  (*See* Debtor Exh. 1, Nos. 32-36; ECF No. 28 at 36

(testimony of the Debtor).)  She stated that she cleaned the carpets but did not replace them.  (*See*

*id*. at 48-49.)  While "a tenant may be liable for the cost of cleaning a rug which has become urine-

stained because of the tenant's dog," *Agostino*, 2011 WL 5307381, at *5, no evidence was admitted

from which the court could assess the cost of cleaning the carpet. Consequently, the Debtor may not deduct the cost for cleaning the carpet from the Security Deposit.

**The Missing Stopper**

The Debtor testified that a stopper was missing from one of the new bathroom sinks and presented a picture that depicted the missing fixture. (*See* Debtor Exh. 1, No. 37; ECF No. 28 at 36 (testimony of the Debtor).) She testified that before the Plaintiffs moved into the Premises all the bathrooms were redone with new vanities, new tile floors and new toilets. (*See id.* at 36.) She also testified that she did not replace the missing fixture. (*See id*. at 49.) Moreover, the Debtor no longer owns the Premises. Because the Debtor did not replace the stopper, she did not incur that cost and cannot deduct it from the Security Deposit.

**Stains throughout the Premises**

The Debtor next testified that certain areas of the Premises were left with stains made by the Plaintiffs. She stated that some kind of a toilet cleaner was left to hang and dripped onto the brand new tile floor and caused a blue stain in the grout of the tile. (*See* Debtor Exh. 1, No. 42; ECF No. 28 at 37 (testimony of the Debtor).) She stated that she tried to clean the blue stain but was unsuccessful. (*See id.* at 50.) The Debtor testified that the Plaintiffs left a stain in the pantry (Debtor Exh. 1, No. 43), a stain in the countertop that she was unable to get out (*id.*, Nos. 48-49) and a stain in the kitchen sink (*id.*, No. 50). However, none of the foregoing was replaced and the court is unable to assess the cost of cleaning.

**Dirty Areas in the Premises**

The Debtor testified that the Plaintiffs left a dirty bathroom tub with hair (Debtor Exh. 1, No. 41), a dirty bathroom sink (*id*., No. 38), a dirty toilet (*id*. Nos. 39-40), a dirty stove (*id*., Nos. 30-

31), a dirty refrigerator (*id.*, No. 6) and left debris throughout the Premises (*id.*, Nos. 43-47, 57). There was, however, no testimony of replacement or repair with respect to any of the foregoing and the court is unable to assess the cost for any cleaning.

## Other Miscellaneous Damage

The Debtor also testified that the Plaintiffs removed the smoke detectors from their original locations (Debtor Exh. 1, No. 51) and placed them elsewhere (*id.*, No. 52), caused nail damage to the wall (*id.*, No. 53), damaged the kitchen closet door so it was hanging off the hinges (*id.*, Nos. 54-55), damaged the closet door in the hallway so it was broken off and left off its track (*id.*, No. 56) and caused damage to the front garden (*id.*, Nos. 58-59). Again, the Debtor did not testify that she incurred any expense to replace or repair any of the foregoing. Moreover, she no longer owns the Premises. Therefore, no charge related to any of the foregoing damage can be deducted from the Security Deposit.

The Debtor testified that she spent about 17 ½ hours over a weekend cleaning the Premises herself and spent about $125.00 for cleaning supplies. (*See* ECF No. 28 at 50, 61.) However, no evidence was presented from which the court could make a reasonable estimate of the value to be accorded to the Debtor's time spent cleaning the Premises. Therefore, the court is unable to award the Debtor damages for those services. Further, the cost of cleaning supplies will not be deducted from the Security Deposit. *Cf. Agostino,* 2011 WL 5307381, *6. Accordingly, the court concludes that the Debtor has failed to carry her burden with respect to deductions from the Security Deposit and no such deductions were appropriate here. Consequently, the Plaintiffs is owed the sum of $7,200.00 (plus Interest, the "Debt"). The court must now determine if the Debt is dischargeable pursuant to 11 U.S.C. § 523(a)(4).

- 16 -

IV.    **ANALYSIS UNDER DISCHARGEABILITY PROVISION**

A.    **In General**

11 U.S.C. § 523 provides in relevant part as follows:

(a) A discharge under section 727 . . . of this title does not discharge an individual
debtor from any debt–

. . .

(4) for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or
larceny.

11 U.S.C.A. § 523 (West 2013).  Exceptions to discharge must be strictly construed in favor of the

debtor in order to effectuate the fresh start policy of bankruptcy.  *See Rosenblit v. Kron (In re Kron)*,

240 B.R. 164, 165 (Bankr. D. Conn. 1999) (Krechevsky, J.).  The party seeking to establish an

exception to the discharge of a debt bears the burden of proof by a preponderance of the evidence.

*See Grogan v. Garner,* 498 U.S. 279 (1991); *Ramos v. Rivera (In re Rivera),* 217 B.R. 379, 384

(Bankr. D. Conn. 1998) (Dabrowski, J.).

B.    **Application of the Law**

1.    **"Fiduciary"**

This court has previously determined that a landlord holding a security deposit pursuant to

Conn. Gen. Stat. § 47a-21 does so in a "fiduciary capacity" within the purview of 11 U.S.C. §

523(a)(4) reasoning as follows:

"[A] security deposit . . . is the tenant's property . . . that the landlord holds
. . . for the tenant's benefit subject to the tenant's fulfilling all . . . obligations under
the lease." *Beal Bank, SSB v. Airport Indus. Ltd. P'ship*, 74 Conn. App. 460, 463
(2003). Conn. Gen. Stat. § 47a-21(h)(1) requires a landlord to "immediately" deposit
the security deposit in an escrow account and appoints the landlord the escrow agent
for the account.  *See id.*  As escrow agent, the landlord is prohibited from
withdrawing any portion of the security deposit from the escrow account except as
stated in Section 47a-21(h)(4), which includes the return of the security deposit to the

- 17 -

tenant or deducting amounts for damages caused by the tenant.  *See id.*  Under
Connecticut law, the obligations imposed by Section 47a-21(h) are sufficient to
create a fiduciary relationship between a landlord (or his/her agent) and a tenant.

> Monies retained in the [escrow] account belong to the tenant, by
> operation of law.  In agreeing to act as escrow agent, the defendant .
> . . agreed to assume duties and responsibilities under the lease
> agreements, and the appropriate provisions of the General Statutes.
> A breach of these duties owed to . . . [the tenant] in its capacity as
> escrow agent, may subject . . . [the defendant] to damages
> proximately caused by its breach of duty.

> As escrow agent, . . . [the defendant] exercised control over funds
> belonging to the tenant. It therefore assumed a fiduciary responsibility
> concerning those funds . . . .

*See Ingels v. Saldana,* No. CV040411529S, 2006 WL 1229938, at *4 (Conn. Super.
Ct. Apr. 17, 2006), *aff'd,* 103 Conn. App. 724 (2007) (footnote omitted).  *See also
Murphy v. Grigas*, No. CV-H-8903-3129SW, 1992 WL 436241, at *6 (Conn. Super.
Ct. Dec. 4, 1992) (The defendant "utilized plaintiffs' security deposit for his own
personal needs; failed to keep those funds in an escrow account and failed to
discharge his fiduciary duties owed to the plaintiffs . . . in violation of various
provisions of § 47a-21.").

However, not every state-law fiduciary is a Section 523(a)(4) "fiduciary."
That is because the "definition of 'fiduciary capacity' is a matter of federal law."
[*Stowe v. Bologna (In re Bologna)* 206 B.R. 628, 632 (Bankr. D. Mass. 1997)].  The
Second Circuit has rejected the argument that a "fiduciary" is limited to trustees of
actual or technical trust but has held that "certain relationships not constituting actual
[or technical] trusts are within the defalcation exception." *Andy Warhol* [*Found. for
Visual Arts, Inc. v. Hayes (In re Hayes)*], 183 F.3d [162,] 169 [(2d Cir. 1999)].  In
this case, a technical trust flowing from duties imposed by the CT Statute is alleged
as the basis for a fiduciary relationship between the Debtor and the Plaintiff.  (*See*
[Adv. Pro. No. 11-3004] ECF No. 40 at 9.)  A technical trust arises "as a result of
defined obligations imposed upon the debtor by statute or common law." *Zielinska
v. Smith (In re Smith)*, 469 B.R. 147, 154 n.6 (Bankr. D. Conn. 2012) (Dabrowski,
J.)  A technical trust is found where the subject statute "(1) defines the trust res, (2)
spells out the trustee's fiduciary duties, and (3) imposes a trust prior to and without
reference to the wrong that created the debt." *Bologna*, 206 B.R. at 632.  *See also*
[*Tanneberger v. Paeplow (In re Paeplow)*, 217 B.R. 705, 709 (Bankr. D. Vt. 1998)]
("For the statute to create a trust it must define the trust res, spell out the trustee's
duties and impose a trust prior to any wrongdoing.").  "[T]he statue must manifest

- 18 -

an express legislative design to create a trust or trust-type relationship." *In re Bologna, supra* at 632.

Under the CT Statute, the trust res is the security deposit (plus interest) received by the landlord. As stated above, the landlord is appointed as escrow agent with respect to the security deposit and is burdened by certain duties in respect of the security deposit (*e.g.*, to open the escrow account and to maintain the funds in that account pending the termination of the tenancy). Further, the CT Statute makes clear that the security deposit remains the property of the tenant, is exempted from attachment and execution by creditors of the landlord and does not become part of the estate of a landlord in any legal proceeding. All of the foregoing establish a technical trust over which the landlord holds a fiduciary responsibility. *See Smith*, 469 B.R. at 154 ("It is accepted that a debtor acts in a fiduciary capacity under § 523(a)(4) if he serves under a technical . . . trust." (footnote omitted)). For the foregoing reasons, the court determines that a landlord holding a security deposit pursuant to Conn. Gen. Stat. § 47a-21 does so in a "fiduciary capacity" within the purview of 11 U.S.C. § 523(a)(4).

*Dennis v. Hall (In re Hall)*, 483 B.R. 281, 292-94 (Bankr. D. Conn. 2012).

## 2.   **"Defalcation"**

"Defalcation" covers "a failure to produce funds entrusted to a fiduciary and applies to conduct that does not necessarily reach the level of fraud, embezzlement or misappropriation." 4 Alan N. Resnick & Henry J. Sommer, *Collier on Bankruptcy* ¶ 523.10 [1][b], at 523-71 (16th ed. 2012). This court previously recognized that currently there is a split among the circuits with respect to whether a "'defalcation' under § 523(a)(4) includes all misappropriations or failures to account or only those that evince some wrongful conduct." *Hall*, 483 B.R. 281 at 294 n.11. The Supreme Court of the United States has granted certiorari to resolve the issue. *See Bullock v. BankChampaign, N.A.*, 133 S.Ct. 526 (2012). However, the Second Circuit has determined that a "defalcation under § 523(a)(4) requires a showing of conscious misbehavior or extreme recklessness–a showing akin to the showing required for scienter in the securities law context."

*Denton v. Hyman (In re Hyman)*, 502 F.3d 61, 66 (2d Cir. 2007), *cert. denied*, 555 U.S. 1097 (2009).

In *Hyman*, the Second Circuit stated further:

> We believe that these concepts–well understood and commonly applied in the securities law context–strike the proper balance under § 523(a)(4). This standard ensures that the term "defalcation" complements but does not dilute the other terms of the provision–"fraud," "embezzlement," and "larceny"–all of which require a showing of actual wrongful intent.
>
> By requiring the courts to make appropriate findings of conscious misbehavior or recklessness in the course of dischargeability litigation, the standard we adopt today insures that the harsh sanction of non-dischargeability is reserved for those who exhibit "some portion of misconduct." [*Central Hanover Bank & Trust Co. v.*] *Herbst*, 93 F.2d [510, 512 (2d Cir. 1937)]. The standard does not reach fiduciaries who may have failed to account for funds or property for which they were responsible only as a consequence of negligence, inadvertence or similar conduct not shown to be sufficiently culpable. This standard, we believe, also has the virtue of ease of application since the courts and litigants have reference to a robust body of securities law examining what these terms mean.

*Hyman*, 502 F.3d at 68-69 (citations omitted).

In the matter before the court, the Debtor testified that upon receipt of the Security Deposit she placed the funds in her regular checking account and not in an escrow account as required by Conn. Gen. Stat. § 47a-21(h)(1). She further admitted that those funds were commingled with her own funds and eventually were used by her on personal matters. Consequently, the funds were used long before the termination of the tenancy in contravention of the CT Statute. The Debtor testified that she had never been a landlord until she rented the Premises to the Plaintiffs but admitted that she had been a realtor for about ten years. Some knowledge of landlord procedure reasonably can be imputed to the Debtor given her background as a realtor. Therefore, the fact that this was her first time as a landlord is unavailing. Accordingly, the court concludes that the Debtor's failure to deposit the Security Deposit in an escrow account, her commingling of the funds in her personal account and

her use of the funds for personal purposes prior to the termination of the tenancy all violated her

fiduciary obligations and demonstrate the requisite level of culpability.  Consequently, the court

determines that the Debtor's conduct constituted a "defalcation" within the meaning of Section

523(a)(4).  Therefore, the court concludes that the Debt is nondischargeable pursuant to 11 U.S.C.

§ 523(a)(4).

## V. <u>ANALYSIS UNDER CUTPA</u>

### A.      <u>Conn. Gen. Stat. § 42-110b</u>

Conn. Gen. Stat. § 42-110b(a) provides: "No person shall engage in unfair methods of

competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." *Id.*

In general, Connecticut courts use the "cigarette rule" promulgated by the Federal Trade Commission

to determine whether a practice is unfair and violates CUTPA. *See e.g., Am. Car Rental, Inc. v.*

*Comm'r of Consumer Prot*., 273 Conn. 296, 305–06 (2005).  Under that rule, the court determines:

"(1)whether the practice, without necessarily having been previously considered unlawful, offends

public policy as it has been established by statutes, the common law, or otherwise—in other words,

it is within at least the penumbra of some common law, statutory, or other established concept of

unfairness; (2) whether it is immoral, unethical, oppressive, or unscrupulous; (3) whether it causes

substantial injury to consumers, [competitors or other business persons]." *Ramirez v. Health Net of*

*Northeast, Inc.*, 285 Conn. 1, 19 (2008) (alteration in original).  Further, "[a]ll three criteria do not

need to be satisfied to support a finding of unfairness.  A practice may be unfair because of the

degree to which it meets one of the criteria or because to a lesser extent it meets all three. Thus a

violation of CUTPA may be established by showing either an actual deceptive practice . . . or a

practice amounting to a violation of public policy." *Id.* (citations omitted).

- 21 -

The Connecticut Supreme Court has held that CUTPA may be applied to residential landlord-tenant transactions. *See Conaway v. Prestia*, 191 Conn. 484 (1983) (holding that landlord's knowing failure to obtain certificates of occupancy while continuing to accept rental payments constituted unfair acts or practices within the meaning of Section 42-110b). A violation of Conn. Gen. Stat. § 47a-21(h) (*i.e.*, the security deposit provision) "may constitute a violation of public policy under CUTPA." *Sapere v. Intertown Realty Co.*, No. CVH-7128, 2006 WL 901981, *5 (Conn. Super. Ct. Apr. 3, 2006). However, "[n]ot every violation of a statute supports a claim for CUTPA relief." *Id.* (citation and internal quotation marks omitted). In the specific context before the court, at least one Connecticut court has determined that the landlord's failure to either return the tenant's security deposit or to forward an itemized list of deductions of damages was a CUTPA violation. *See Fitzpatrick v. Scalzi*, 72 Conn. App. 779 (2002) (affirming the trial court's acceptance of a report by an attorney trial referee). *But cf. Tarka v. Filipovic*, 45 Conn. App. 46, *cert. denied*, 242 Conn. 903 (1997).

### B.    Conn. Gen. Stat. § 42-110g

Conn. Gen. Stat. § 42-110g(d) provides: "In any action brought by a person under this section, the court *may* award, to the plaintiff, in addition to the relief provided in this section, costs and reasonable attorney's fees based on the work reasonably performed by an attorney and not on the amount of the recovery." *Id.* (emphasis added). An award of attorney's fees under CUTPA is within the discretion of the trial court. *Staehle v. Michael's Garage, Inc.*, 35 Conn. App. 455, 459 (1994). "The use of the word 'may' indicates that the statute does not provide a mandatory award of fees to the plaintiff; rather, the court has discretion to award attorney's fees." *Id.   Accord*

*Gargano v. Heyman*, 203 Conn. 616, 622 (1987); *MedValUSA Health Programs, Inc. v. Memberworks, Inc.*, 109 Conn. App. 308, 314-15 (2008).

###### C.       Application of the Law

In this matter, it is not necessary for the court to determine if the Debtor's actions violated CUTPA.  That is because the court, in its discretion, declines to award the Plaintiffs their attorney's fees.  The court is persuaded that the Plaintiffs did substantial damage (at least negligently) to the Premises even though the Debtor was unable to quantify the amount of such damages.  Given the foregoing, the court also is persuaded that the award of Interest and statutory double damages is sufficient recompense to the Plaintiffs.

## VI.     CONCLUSION

For the reasons set forth above, the court hereby concludes that (a) the Debt is nondischargeable in this chapter 7 case and (b) the Plaintiffs will not be awarded their attorney's fees on the CUTPA claim.

With respect to the nondischargeable Debt, it hereby is **ORDERED** that on or before May 6, 2013, the Plaintiffs shall file (and serve upon the Debtor) a calculation (the "Calculation") of Interest due on the Security Deposit under applicable state law.  The Debtor may file an objection to the Calculation on or before May 20, 2013.  If an objection is filed by the Debtor in accordance herewith, a hearing shall be scheduled with respect to the Calculation by a separate notice of hearing. If no objection is filed, judgment may enter against the Debtor in accordance herewith and in

- 23 -

accordance with the Calculation.  If a Calculation is not filed and served in accordance herewith,

Interest will be deemed waived and judgment will enter in accordance with this memorandum.

**IT IS SO ORDERED.**

Dated: April 22, 2013                                         BY THE COURT

_Lorraine Murphy Weil_

**Lorraine Murphy Weil**
Chief United States Bankruptcy Judge
